[Civ. No. 1911. Third Appellate District.—December 24, 1919.]

STINSON CANAL AND IRRIGATION COMPANY (a Corporation), Respondent, v. THE LEMOORE CANAL AND IRRIGATION COMPANY et al., Appellants; CRESCENT CANAL COMPANY (a Corporation), Intervener and Respondent.

[Civ. No. 1912. Third Appellate District.—December 24, 1919.]

STINSON CANAL AND IRRIGATION COMPANY (a Corporation), et al., Respondents, v. THE PEOPLE'S DITCH COMPANY (a Corporation), et al., Appellants.

[1] Waters and Water Rights—Prescription—Excessive Diversion. One actually diverting water under a claim of appropriation for a useful or beneficial purpose cannot by such diversion acquire any

1. Correlative rights of upper and lower proprietors as to appropriation of water, note, 41 L. R. A. 743.; right of prior appropriator, note, 30 L. R. A. 665, 668.

right to divert more water than is reasonably necessary for such use or purpose, no matter how long a diversion in excess thereof has continued.

[2] ID.—AMOUNT OF WATER NECESSARY—WEIGHT OF OPINION EVIDENCE.—In determining whether the amount of water in fact used on a given acreage was applied to a beneficial use and was reasonably necessary for irrigation and the other purposes to which it was devoted, the testimony of farmers, and of superintendents, ditch-tenders, stockholders, irrigators, and the presidents and directors of the various irrigation systems, whose actual knowledge of the lands and the use of water thereon has extended over a period of years, is of a higher quality than the mere opinion of experts who have made a mere casual or theoretical survey of the lands.

[3] ID.—PRESUMPTION IN FAVOR OF PRIOR APPROPRIATOR.—In determining how much of the water in fact used on a given acreage was reasonably necessary for the purpose for which it was used, a court should be liberal with the appropriator to the extent, at least, that it should not deprive him of any portion of the amount of water that he has in fact used· for the period necessary to gain title by prescription, unless it is clearly and satisfactorily made to appear that he has used more than was reasonably necessary.

[4] ID.—CONFLICTING RIGHTS TO WATERS — ERRONEOUS RULINGS OF TRIAL COURT—PREJUDICIAL CONDUCT—PREPONDERANCE OF EVIDENCE —NEW TRIAL.—In these actions involving the rights of various companies to divert water from a given river for irrigation purposes, the various rulings of the trial court with reference to the admission and rejection of evidence, standing alone, were such that they might have been regarded as without prejudice, but when coupled with the conduct of the trial judge and the fact that the evidence preponderates in favor of appellant, were such that the interests of justice demanded a new trial.

APPEAL from a judgment of the Superior Court of Fresno County. George E. Church, Judge. Reversed.

The facts are stated in the opinion of the court.

E. C. Farnsworth, L. L. Cory and H. Scott Jacobs for Appellants.

Short & Sutherland, Frank H. Short, W. A. Sutherland and M. K. Harris for Respondents.

BURNETT, J.—These two cases, and another, *Cuthbert Burrell Co. et al.* v. *People's Ditch Co. et al., post,* p. 795,

[188 Pac. 85], were tried together, and there is but one
bill of exceptions in all three cases.  It was agreed, at the
oral argument herein, that these two could and should be
treated in one opinion, since they involve the same general
issues as to the rights of the Stinson Canal Company and
the Crescent Canal Company.  The trial of the cases con-
sumed a period of twenty-six days, and the record em-
braces over two thousand four hundred printed pages.
The transcript and the briefs contain conclusive evidence
of the stupendous amount of labor on the part of counsel
in the trial, and in the presentation of the cases on appeal.
It may be added that it has been no small task to examine
the voluminous record, and it is scarcely less difficult to
determine to what controverted points specific attention
should be given in this opinion.  The embarrassment of the
situation may be suggested by the statement that there are
over four hundred assignments of error, and 150 of these are
argued with apparent sincerity and confidence by the able
and distinguished counsel for appellants.  If the opinion
is not to be unduly prolonged, most of these points, of
course, must go without recital, exposition, or discussion.
Indeed, few of them possess merit, and it is considered
necessary to notice only two or three controverted points.

Speaking generally, it may be stated that in the first
action the complaint alleges that plaintiff is the owner of a
canal which leads out of a certain slough, called Boggy
Slough, connected with Kings River, in Fresno County, and
that plaintiff has the right to divert from this slough 165
cubic feet per second of the waters of said Kings River and
to use the same for irrigation and other useful purposes;
that plaintiff has used this water continuously for fifteen
years; that the defendants claim an interest in these waters
adversely to plaintiff, but without right; that about the 1st of
March, 1905, by means of a certain ditch constructed by de-
fendants, they wrongfully diverted from the river, and ever
since have continued to divert a large quantity of water, about
85 cubic feet per second, which belongs to plaintiff and
which, otherwise, would have flowed down the river into
plaintiff's ditch and have been diverted and used by plain-
tiff.

The Crescent Canal Company filed a complaint in inter-
vention, by which it appears that said company owns a

canal which heads in the lower north fork of Kings River and runs across the country in Fresno County in a general westerly direction for about twenty miles, and that it is the owner of a right to divert, by means of this canal, 213 cubic feet of water per second and to use the same for irrigation and other purposes; that for more than twenty years it has diverted this amount of water "openly, peaceably, continuously, and uninterruptedly, under claim of right against defendants and the whole world"; that defendants claim a right to this water adversely to intervener, but without any right thereto. Defendants, in their answer to plaintiff, alleged that they have a prior right to use and divert from Kings River six hundred cubic feet of water per second; that they are the owners of a large ditch—which is described—that was constructed in 1873, and that, by means of this ditch, the said Lower Kings River Water Ditch Company, from October, 1873, to October 18, 1902, appropriated and used for irrigation, and other useful purposes, said amount of water; that on the latter date said company granted and conveyed unto the Lemoore Canal and Irrigation Company its said ditch and the right to divert from said Kings River said quantity of water, and that ever since said date said grantee has appropriated and diverted from said river, except when unlawfully prevented by other parties, the said six hundred cubic feet of water per second, and that said grantee has been the owner of said ditch and the right to appropriate and divert from Kings River said quantity of water; there is also a suitable allegation of title by prescription to said amount of water and that plaintiff's cause of action is barred by the statute of limitations. The answer to the complaint in intervention is of a similar nature, and the prayer is, likewise, that the intervener take nothing, and that it be adjudged that appellants are entitled to six hundred cubic feet of water per second, and that they have a prior right to said water. The complaint in this action was filed on April 26, 1905; the answer thereto was filed on November 9, 1905; the complaint in intervention was filed on December 3, 1906, and the answer to this on March 9, 1909. It may be stated that there is really only one appellant in this action, to wit, the Lemoore Canal and Irrigation Company.

On October 1, 1906, the second action was brought, the Stinson and the Crescent Company uniting in the complaint. This pleading, in its averments, is similar to the other complaints hereinbefore alluded to, and as to the defendants it alleges that within two years last past they have "unlawfully without right, and against the wishes of plaintiffs entered upon Kings River above plaintiff's said points of diversion and by means of dams and obstructions placed in the river and by means of large ditches leading therefrom have wrongfully and without plaintiffs' consent appropriated and diverted from said river through their respective ditches a large quantity of water, to wit, about four hundred cubic feet of water per second and have deprived plaintiffs of the waters of said river." The prayer was for an injunction to restrain the defendants from diverting said water or any portion thereof. The defendants filed a joint answer in the case denying the material allegations of the complaint and alleging as affirmative matter that ever since 1873 the People's Ditch Company has been and is now the owner of a large ditch constructed to convey part of the water of Kings River for the purpose of irrigation and other useful purposes from the head of its ditch into the county of Kings; that said company is the owner of the right to so divert six hundred cubic feet of water per second and that it has, ever since March, 1874, so appropriated and diverted from said river, except when unlawfully prevented by other parties, said amount of water when there was a sufficient quantity flowing in the river, and that it has been continuously used for said purposes. In said answer appears a similar claim of the Last Chance Water Ditch Company to six hundred cubic feet of water per second. It is also disclosed that the stockholders of both these canal companies have been and are the "owners of large quantities of agricultural and horticultural lands in Kings County which have been and are now used by said stockholders for raising agricultural and horticultural crops and domestic stock, and that these lands, in order to be successfully cultivated so as to produce crops, require irrigation and without irrigation they will not produce crops and without water said stockholders will be unable to keep or maintain livestock upon their lands." It was averred that this right to said one thousand two hundred cubic feet of water is superior to any of the rights of plaintiffs

or either of them, and, furthermore, that defendants have a prescriptive title to this water by reason of adverse use thereof for more than five years.

The cases were tried in 1913—eight years after the first complaint was filed—and judgment was rendered in January, 1914. A motion for a new trial in each case was made and it was denied on March 6, 1916. On the third day of April following, the appeal was taken.

In the first case, the court found that the defendant, the Lemoore Company, as successor in interest to the defendant, Lower Kings River Company, is entitled to divert from Kings River, at the head of its canal, 250 cubic feet of water per second; that the plaintiff, the Stinson Company, is entitled to divert from said river 165 cubic feet per second, and the intervener, the Crescent Company, is entitled to divert 213 cubic feet per second from said river; that the right of the Lemoore Company is superior and prior to the right of either the Stinson or the Crescent Company to the extent of said 250 feet, but no more, and it was decreed that defendant, the Lemoore Company, be enjoined from diverting any greater quantity of water than said 250 cubic feet, or in any manner from interfering with the additional flow of the waters of said river or any of its branches or channels to the head of the respective canals of the plaintiff and the intervener to the full extent and quantity of the said 165 and 213 feet, respectively.

In the second case, the court found that the defendant, People's Ditch Company, was entitled to divert and appropriate 360 cubic feet of water per second from said river, and the Last Chance Company 250 cubic feet per second, and that each of these rights is superior and prior to the rights of plaintiffs, or either of them. The finding as to the right of appropriation by the Stinson and the Crescent Company was the same as in the other case, confining them to said 165 and 213 feet and providing that their rights are prior and superior to the rights of the defendants to divert any water in excess of the said 360 feet by the People's Company and the 250 feet by the Last Chance Company. The defendants were, therefore, restrained and enjoined from diverting water in excess of said amounts.

Thus, we see that respondents were awarded the amount of water which they claim, but its appropriation was made

subject to the prior right of the Lemoore Company for 250 cubic feet per second, of the People's Company for 360 feet, and of the Last Chance for 250 feet. Appellants, however, were dissatisfied with the decision of the trial court as to the number of feet of water to which they were and are entitled, and hence their appeal.

An important and, indeed, vital question in the case is whether the evidence does not compel the conviction that appellants are entitled to more water than was awarded them; or, conversely, whether there was any substantial showing to support the conclusion of the court that their prior right should be limited to the number of feet which we have mentioned. This consideration resolves itself into the two elements: First, the number of cubic feet which was appropriated by appellants; and, second, the number of feet that was necessary for the purpose to which the water was devoted, or, in other words, the extent of the "duty of water" required by the situation of said appellants. It is conceded that these are the elements involved in the inquiry, and, moreover, it cannot be disputed that, as to both considerations, appellants made an impressive showing. Many farmers, and others who were familiar with the construction and operation of appellants' canals, testified to facts strongly supporting the inference that for many years the asserted amount of water was appropriated and used. This was supplemented and aided by actual measurements of the flow in said canals, which were made by various experts, who testified to the results of their investigations.

As to the quantity of water needed for appellants' purposes, quite a number of competent witnesses testified that the full amount claimed was actually needed and was reasonably necessary for the proper irrigation of the lands covered by the several water systems of appellants, and for the use of their stock. In their brief they set out at length this evidence, contrast it with what they are pleased to call the "very weak and unsatisfactory showing" of respondents, and they declare themselves "at a loss to see why or under what theory the trial court allowed plaintiff, Stinson Canal and Irrigation Company, 165 feet of water per second with only about eight thousand acres of land under cultivation; or why the court granted the Cres-

cent Canal Company 213 cubic feet of water per second with only about ten thousand acres," while appellants were allowed only 860 cubic feet with some one hundred and thirty-five thousand acres of land to be supplied with water.

To this assertion, respondents answer: "Appellants' only difficulty in connection with this branch of the case seems to have resulted from a failure to appreciate that the amount of water awarded to the respective parties in *second-feet* do not at all, of themselves and without a consideration of their relation to *acre-feet,* indicate anything as to the correctness of the judgment. Obviously the duty of water must be resolved upon a consideration of the needs of the lands in question in acre feet, even though to produce a given result in acre-feet the second-foot unit of measurement must be adopted. It is therefore the effect of the judgment in producing acre-feet for the respective parties which is to be considered and not the number of second-feet allotted to them respectively." Indeed, it can be said, with fairness to respondents, that they do not seriously dispute the contention of appellants as to the amount of water appropriated and used by them for many years, but they seek to justify the judgment on this very ground that the lands thus irrigated required no more water than the court allotted to them. In fact, they quote the testimony of their own witnesses to show that appellants were greatly favored, in that their canals were so located and constructed as to enable them, for many years, to enjoy the prior appropriation and use of a much larger volume of water than was awarded them by the lower court, and also larger than was available for the use of respondents.

Respondents insist that the court's award is justified upon the theory of the duty of water and the beneficial use upon appellants' lands, and they decline to consider specifically any question as to the size and capacity of the ditches of the respective parties or the quantity of water diverted by these ditches and distributed to the lands of the various irrigating systems.

In support of their contention that the needed and beneficial amount of water was awarded, they claim, in the first place, that the number of acres of land actually irrigated by appellants has been exaggerated by the latter; and, in the second place, conceding that the extent of the irrigated

area has been correctly represented by appellants, nevertheless, the finding of the trial court that the amount awarded to them is sufficient for the beneficial use to which it is and has been applied is supported by credible evidence.·

As to the area of the land actually irrigated, there is room for some diversity of opinion, but it is deemed unnecessary to quote the evidence in that respect.

Concerning the amount of water required by each irrigated district—whatever its extent—in other words, how much water could be devoted to a beneficial use, it is deemed proper to notice more particularly the contentions of the parties. [1] As to the legal principle involved in the question, it is not disputed that it is the settled law of this state "that one actually diverting water under a claim of appropriation for a useful or beneficial purpose cannot by such diversion acquire any right to divert more water than is reasonably necessary for such use or purpose, no matter how long a diversion in excess thereof has continued, and that there is no such thing as the acquirement by such appropriation of a title by prescription in so far as the excessive diversion is concerned." (*California etc. Co.* v. *Madera etc. Irr. Co.,* 167 Cal. 78, [138 Pac. 718].)

The rule is very clearly stated also in *Hufford* v. *Dye,* 162 Cal. 153, [121 Pac. 403], as follows: "It is the well-settled law of this state that one making an appropriation of the waters of a stream acquires no title to the waters, but only a right to their beneficial use and only to the extent that they are employed for that purpose. His right is not measured by the extent of his appropriation as stated in his notice or by his actual diversion from the stream, but by the extent to which he applies such waters for useful or beneficial purposes. Beyond that his appropriation or diversion of more than can be applied by him gives him no right to the excess, and this is subject to appropriation by any other person who may use it for similar beneficial purposes."

On this branch of the case, to support their theory, respondents relied largely upon the testimony of certain experts, among whom the most important are I. Teilman, W. C. Hammatt, and F. E. Twining. The first had been engaged in distributing and supervising the distribution and

use of water for irrigation under several different systems in the valley, and had made a special study of the subject of the duty of water; he was familiar with the canals of the Lemoore Company and the People's Company, and the crops irrigated therefrom, and he had recently made a detailed examination of those systems and the lands subject thereto. He testified as to the amount of water required by the orchards, vineyards, and alfalfa throughout these districts, and concluded that a duty of water of one acre-foot would be sufficient. It was also his opinion that too much water had been used on the lands of appellants, thereby causing "the country to be water-logged." Ascribing the duty of water indorsed and advocated by this witness, it would be a reasonable inference that the court awarded to appellants, the Lemoore and the People's Company, as much water as they could use to advantage on the land.

W. C. Hammatt had been a civil engineer for twenty years and he was experienced regarding the use of water for irrigation purposes; acting for respondents, he had investigated the territory under the three canal systems of appellants. He described, in detail, his investigations, and concluded that "taking it altogether" water to the depth of one foot would be sufficient for the irrigation of the whole territory. His opinion, also, it may be said, supports the theory of respondents that appellants are accorded all the water they actually need for irrigation. However, it may be well to note that his knowledge of the territory was acquired by this witness in a two days' automobile trip in which he traveled 180 miles; and, as to his examination of the soil, he testified: "My examination there was the same as the others, merely a superficial examination of the soil conditions, kicked up a little dirt and picked it up in my hands and threw it away again." His examination was rather hurried and incomplete, one would think, to form the basis for an opinion of much value as to the needs of some one hundred and thirty-five thousand acres of land. But, of course, we cannot say how much weight it was accorded by the learned trial judge.

F. E. Twining, analytical chemist, made an extensive examination of the territory covered by the irrigation systems of appellants, analyzing some seventy samples of soil. He testified at great length and the written report of his investi-

gations was received in evidence. The report covers thirty pages of the transcript and constitutes a comprehensive review of the character and condition of the various soils of the irrigated territory. The following quotation will afford some indication of the nature of this report: "(17–21) badly encrusted all around. South between 1-(18–21) and 6 (18–22) 1 S. W. 12 Sample section 1 N. E. Cor. 7 Gov. map good—Hanford Sand. South of this to Hanford with exception of 2 or 3 spots, in Fancher Sandy Loam. Fancher Sandy Loam—covers a considerable area near the center of and small areas throughout the Hanford district. This soil contains enough clay to bind the soil grains and if cultivated in a wet condition often bakes and forms clods. In much of this area the water-table is kept very close to the surface during the irrigating season and certain small areas and depressions have become water soaked resulting in drowning out of crops and accumulation of alkali. The soil does not contain much alkali but over irrigation, especially subirrigation is, however, always dangerous as the soluble salts become concentrated on the surface and become injurious or even prohibitive to plant growth. This has occurred in many places throughout the area." Of course, we cannot say with certainty, but we think it probable that the report and testimony of this witness were considered by the trial court of great, if not of decisive, importance.

These witnesses were met by expert witnesses on the part of appellants, who gave a different account of the said territory as to the character of the soil and other conditions, and who expressed the opinion that the land had not been excessively irrigated. In the matter of experts, therefore, there was a sharp conflict and the not unusual antagonism. It must be admitted, however, that as to actual knowledge of the care, cultivation, and development of the land through a long period of years, the advantage was all upon the side of appellants. Farmers from nearly every section of the said irrigation districts testified as to the land which they knew had been irrigated by the respective canals of appellants. Also, their superintendents, ditch-tenders, stockholders and irrigators, the presidents and directors of the various systems, testified from their observation, experience, and knowledge; and, if credit be given to this mass of testimony, the conclusion would almost inevitably follow, not

only that appellants used, through a long period of time,
the amount of water which they claimed, when it was avail-
able in Kings River, but that they irrigated substantially
the said number of acres, to wit, one hundred and thirty-
five thousand; and that said water was applied to a bene-
ficial use and that it all was reasonably necessary for irriga-
tion and the other purposes to which it was devoted. [2]
It is true that the credibility of these various witnesses
was to be determined by the exercise of a wise discretion
on the part of the trial judge, and it is not for us to say
that their statements should have been accepted at their
full face value, but it is at least apparent that this class of
testimony is of a higher quality than the mere opinion of
an expert. It is the difference between practice and theory,
between experience and mere observation or examination.
There is this, also, to be said, that it is not at all probable
that a number of farmers would use, for many years, for
the purpose of irrigation, an amount of water that would
destroy or impair the value of their land. Of course, they
would not willingly do so; and it is hard to believe that,
in these days of intelligent and scientifically directed agri-
culture, these men, who have located and built up a thriving
community, would make such a grievous mistake as to cause
deliberately their lands to become water-logged and depre-
ciated for all the purposes of husbandry. The very fact
that they used for so many years a certain quantity of
water is, indeed, very persuasive evidence that such quan-
tity was actually needed for such purposes. It is not con-
clusive evidence of that fact, but it is a circumstance of
impressive significance. The evidence having shown, there-
fore, that appellants diverted and used for many years a
larger quantity of water than is awarded in the judgment,
the strong probability is that it was all needed. The value
of such use as evidence of the need for the water is appar-
ent, and we may add that it is so recognized by the supreme
court in the California Pastoral et al. Co. case, *supra,*
wherein it is said: [3] "In determining how much of
the water in fact used had been reasonably necessary for
the purpose for which it was used, we believe that a court
should be liberal with the appropriator to the ˙extent, at
least, that it should not deprive him of any portion of the
amount of water that he had in fact used for the period

necessary to gain title by prescription unless it is *clearly* and *satisfactorily made to appear* that he has used more than was reasonably necessary. The presumption would appear to be in his favor, for ordinarily one would not take the pains to use upon any land more than was reasonably necessary under all the circumstances.'' It may be added that the thriving orchards, vineyards, and alfalfa fields throughout the district and the number of prosperous farmers therein argue strongly that the water has been at least beneficially appropriated. Again, a portion of the waters—how much does not appear—has been used for stock, which seems to have been overlooked by respondents, and in estimating the amount of water that must be diverted at the head of the canals to irrigate suitably the lands of appellants, allowance does not seem to have been made by the experts for respondents for the amount which must be considered—varying from thirty to fifty per cent—for seepage and evaporation before the water reaches the land to be irrigated.

These things have been mentioned, not for the purpose of holding that the testimony of the experts is necessarily insufficient to support said finding, but to emphasize the importance of the rulings made by the trial court in reference to these witnesses. We may take the instance of the witness Twining as the most striking. After stating that he had made analyses of the soils of this territory at various times and the last ''in February of this year,'' he was asked this question: ''In February of this year, and will you describe in a general way just what you did in making those soil surveys?'' A general objection was made to the question and also, ''that any such examination made at that time of the condition of the soil would not show or tend to show the condition of the soil at the time of the commencement of any of these actions, and it does not prove or tend to prove any issue in the case.'' This examination by the witness was made years after the suits were brought, and before his report was admitted in evidence there should have been some showing that the essential conditions had not materially changed. Indeed, it is a fair inference from the report itself that there had been an important change, at least as to the presence of alkali near the surface of the ground, caused, as he claimed, by excessive irrigation. Respondents

seek to justify the ruling on the ground that both sides offered such evidence on the promise that it would be shown that the conditions remained essentially unchanged, and that appellants, especially, almost at the outset of this case, declared: "We will connect that and show that the same conditions existed prior to the suit as in 1909." The conditions, though, to which appellants referred, related to the amount of water actually used, the number of acres irrigated and the kind of crops produced. In fact, the witness Boland was not permitted to testify as to the character of crops that were grown and produced upon the land and the number of acres of those crops at a time subsequent to the beginning of the actions. In reply to the question of the court: "When was this?" Appellants stated: "He made an examination this year and four years ago. This for the purpose of showing the lands are irrigated and what the water is used for. We expect to connect that and show that the same character of crops were produced before the commencement of the action." The court replied: "I don't like that, because that simply multiplies the evidence almost indefinitely, and this is a very questionable method of procedure. Besides, those things are subject to constant change anyway." Furthermore, in response to a statement by appellants that the only way to make it relevant would be to show that the conditions had not changed, the court said: "That would be impossible. I am solicitous to keep out any irrelevant and immaterial testimony because it occupies so much time." When a motion was subsequently made by appellants to strike out the testimony of respondents relating to the time subsequent to the beginning of the action, the court stated it would be granted if appellants would consent to having all such testimony stricken out, including their own. We think this condition should not have been imposed.

But assuming that the court did not commit prejudical error, or error at all, in overruling said objection to the testimony, appellants attempted to have portions of Twining's said report stricken out on the ground, apparently, that they constituted mere argument and hearsay. The record as to this shows the following: "Mr. Farnsworth: 'If the court please, this statement of the witness, in addition to containing a tabulation of samples and the depths

and what he found as to alkali, contains, I notice on a very cursory examination, many statements and arguments of this witness, and I desire to object to it on that ground. We didn't see this thing and understand from counsel's statement that it was simply a tabulation with reference to that matter, and we have had this—it appears from a cursory examination in the two or three minutes recess.' The Court: 'I think I understand you. It is my understanding that it contains simply was he'— Mr. Sutherland (interrupting): 'It was expressly identified as a transcript of the witness' notes. Now, the notes contain statements as to the character of the soil, whether sandy loam or whatever it might be, and that is included as a very proper part of the report.' The Court: 'Well, proceed with the cross-examination.' Mr. Farnsworth: 'Sir?· I was going to say, we haven't had a chance to examine that thing, and we have had to examine it under a disadvantage under those circumstances—that we haven't had a chance to look at these different matters that are tabulated.' Mr. Sutherland: 'You can look at them one by one as you examine the witness.' Mr. Farnsworth: 'Well, there are eighty-one of them, you state, and over different sections. We haven't had a chance to compare them.' The Court: 'Well, he has testified to a certain number of them. Proceed.' " It is true that appellants made no formal motion to strike out any specific portions of this report, nor did they expressly ask the court for time to examine it, but the court precluded any such action on the part of appellants by summarily ordering them to proceed with the cross-examination. This was a matter of importance, and appellants were entitled to greater consideration than they received. It was proper, undoubtedly, for the witness to refer to the report to refresh his memory (Code Civ. Proc., sec. 2047), and as a mere tabulation of his analysis of the various samples there was no valid objection to its admissibility, but it contained much extraneous matter that should have been excluded.

An attempt was made also by appellants to prove by one of their expert witnesses that Mr. Twining had taken the poorest sections of the irrigated territory from which to select his samples. The court sustained an objection to this line of examination. We think appellants should have been allowed to make the showing for whatever it was worth as

affecting the weight and significance of the deductions to be made from the witness Twining's examination of the character of the soil.

Some other rulings of the court are subject to criticism, but we shall pass them without specific mention.

[4] Whatever mistakes were made in the various rulings of the court might be regarded as without prejudice were it not that the evidence seems to preponderate so strongly in favor of the right of appellants to a larger supply of water than was accorded them, and that the nervous condition of the trial judge was apparently so impaired as to make it difficult for him to consider with due care and patience the contentions and evidence of appellants.

This latter phase of the subject has been stated by one of the counsel for appellants as follows: "Now, in that connection, we think we were not given a fair trial. We are satisfied in our own minds that is fact. Judge Church was the trial judge. No one has a greater admiration for Judge Church than myself. . . . I had no reason to believe he was in the slightest degree prejudiced against these companies simply because they appropriated water and used it in Kings County. I didn't think that would affect his judgment and I don't know consciously that it did, but I do know that when we came to the trial of this case we were met, with the very first witness we produced on the stand with an antagonism that we were not able to overcome. There was not a witness we produced on the stand but that was interrogated, cross-examined, and, in a measure, intimidated by the conduct of the court. Now, I don't mean that he was intentionally prejudiced or that he was taking sides, but there must have been some unconscious bias, to which we are all more or less subject because we are human, that some way or other affected Judge Church in the trial of this case, because I say that the record shows throughout that we did not get an impartial trial." The zeal of counsel, as often happens "because we are human," has led him to overstate the case, but a reading of the record shows no inconsiderable cause for complaint.

In the cross-examination of this witness, Twining, at one point the court said: "It seems to me that any further questions of this nature are obviously meant for mere delay, and I don't want to hear any more of them, because I will

make the same ruling"; again, "If there are a lot of statements which you don't know anything about, ask him, but make it as brief as possible and not ask him a thousand questions when one or two would be sufficient"; further, "I have tried to conduct this case with some degree of expedition, but it is impossible to do so."

While Louis Hansen, a witness for appellants, was being cross-examined the following occurred, as shown by the transcript: "Q. How did you learn the section lines of that section? A. Why there is a road on 17 and 18— The Court: Strike out the answer. Do you know what the question is? Mr. Hansen, do you know what the question is? A. No. The Court: Read the question, then. (Question read.) Mr. Harris: Section 17, right there. (Showing on the map.) A. Yes, sir; I see something on that map, there was no road opened on the north side— The Court: Come back and take your seat, then, the court will know if you are answering the question or not." Several other answers the court of its own motion struck out, and after the witness had stated that he knew the west line of a certain section, the record shows the following: "Q. How did you know, how did you find out? A. That is something I can't hardly explain to you. The county road goes— The Court: Say that you don't know, then. A. All right I will. I did know, in fact, though." The court struck out several other answers of this witness and concluded by lecturing all the witnesses to be perfectly frank and candid and not try to make out a case for either side. When John Rea, a witness for appellants, was on the stand, he was asked "if there was anything to interfere in passing along the road with your view so you could determine with your knowledge of the land how much of the land was actually irrigated from the People's Ditch?" An objection was made to the question and the court said: "I will confess frankly to you that I don't think there is anything of value in any answer or question of that kind." In sustaining an objection to another question the court, among other things, said: "We can't try this case entirely upon hearsay evidence. . . . There ought to be a fair, candid presentation of the matter and nothing else, by a fair, candid witness throughout, so that the court might finally, in determining these matters, determine it in a way that it would, in some

sense, do justice to the people concerned, all of them; that is the only interest that ought to be had by anybody, and it is the only interest that the court has—not to see one party get an advantage of some other party by hook or crook, or something of that kind, but to have a fair and candid presentation so that we know it is such and feel that it is . . . and therefore I get a little irritated when I find that people are willing to say, or anyone is willing to say most anything. I don't like that kind of testimony at all. It is not that kind that ought to come into courts.'' In another instance, when an objection was made by respondents to a question on the ground that it called for a conclusion the court said: ''That is a case with nearly every question, with nine cases out of ten they have called for conclusion or opinion.'' Again, when another witness stated that he was acquainted with the location of the canals, the court: ''What do you mean by that speaking acquaintance, bowing acquaintance?''

To another witness for appellants the court said: ''Don't be trying to make out a case.'' At another point: ''Certainly there ought to be some method of shortening the work. It is so tedious that we can hardly keep awake. There is not enough variety to keep up interest here.'' There was, indeed, some excuse for the impatience of the trial judge. It does seem that the trial was unduly prolonged and it was no doubt true, as the court said: ''Well, I guess we are having our nerves tried a little too much by the strain of the continuous hearing of this case. I find my own nerves, I have to confess, are considerably tried, and I don't know but what I have to apologize to you, all of you.''

But it must be said that great interests were involved, and it is not surprising that counsel were alert and anxious to present every consideration that they deemed important. It may be added that they seem to have been extremely courteous throughout to the trial judge, and they hardly deserved the reprimand that was frequently administered. While said remarks of the court are not to be deemed so serious as if the cause had been tried before a jury, and while some of them were undoubtedly of a jocular nature, and all were well intended, the natural effect upon the witnesses for appellants of the frequent interruptions and lec

tures would be to interfere with and prevent a candid and complete statement of the knowledge of the witness concerning the subject matter of his testimony.

The appropriate attitude of the trial judge is, of course, a matter of general knowledge, and it requires no extended consideration. We may cite, however, in this connection, *Perkins* v. *Perkins,* 29 Cal. App. 68, [154 Pac. 483], and *Pratt* v. *Pratt,* 141 Cal. 247, [74 Pac. 742]. In the former it was held that the court placed an improper restriction upon the plaintiff in the conduct of her case. It was said: "We think that the attitude of the trial judge in restricting counsel in his examination of the plaintiff as to the matter adverted to was error of a prejudicial kind. The case of *Pratt* v. *Pratt,* 141 Cal. 247, [74 Pac. 742], is in point." In this latter case the trial judge virtually threatened to prejudice the testimony of the defendant as a witness and intimated that unless the daughter was withdrawn as a witness, he would regard "the fact of her having contradicted the mother in the father's interest as a matter seriously discrediting the latter's testimony." It was held that this was a prejudicial irregularity preventing a fair trial to the defendant. This case is not so flagrant, but the strictures were so severe as to discourage a full presentation of the evidence. The trial judge, learned and incorruptible as he is, failed to maintain his usual judicial poise, and this fact being considered in connection with the other circumstances to which attention has been directed, it seems that the interests of justice demand a new trial.

The judgment and order in each case are reversed.

Ellison, P. J., *pro tem.,* and Hart, J., concurred.

A petition to have the causes heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on February 19, 1920.

All the Justices concurred.